# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

MONICA HEATH,

                                   Plaintiff,

       v.                                        5:14-CV-223
                                                  (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                   Defendant.

_____

CHRISTOPHER CADIN, ESQ., for Plaintiff

TOMASINA DiGRIGOLI and STEPHEN P. CONTE, Special Asst. U.S. Attorneys, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On January 4, 2011, plaintiff protectively[1] filed for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability beginning March 15, 2006. (Administrative Transcript ("T.") 89, 190-198). Plaintiff's claims were denied initially on April 21, 2011. (T. 135-140). After a hearing

_____

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

on April 10, 2012, at which plaintiff testified, Administrative Law Judge ("ALJ") John P. Ramos denied the applications in a decision issued on August 2, 2012. (T. 86-105). The ALJ's determination became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 2, 2014. (T. 1-7).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work

2

activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a

very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

As of the date of the administrative hearing in April 2012, plaintiff was 47 years old[2]. (T. 133). She left school in the 11th grade but subsequently obtained her GED. (T. 17-8, 123-24, 221, 499). After receiving her cosmetology license in 1983, plaintiff

_____

[2] Plaintiff was 43 years old on the date last insured.

worked as a hair stylist both independently and at various salons. (T. 114, 222, 226, 521, 544). She also held temporary positions packing boxes (2007), and as a bell-ringer for the Salvation Army (2009). (T. 226).

Plaintiff was diagnosed with human immunodeficiency virus ("HIV") in 1999. (T. 432). Plaintiff admitted that she had difficulty taking her anti-retroviral medication regularly, which contributed to instability in her CD-4 count[3] and spikes in her viral load[4], but she described her physical condition as "good." (T.288, 333-334). Plaintiff generally returned to her medicinal regime when she had an outbreak of thrush or related symptoms. (T. 119, 334). Since 2009, plaintiff received mental health treatment for depression, anxiety and post-traumatic stress disorder ("PTSD"), and was diagnosed with attention deficit hyperactivity disorder ("ADHD") in 2011. (T. 443, 472-527).

Plaintiff admitted that she had abused cocaine, heroin, and other drugs "all my life," and smoked marijuana on a daily basis. (T. 121, 127, 470, 516). She participated in individual and group counseling for drug treatment, including Narcotics Anonymous. (T. 121). Plaintiff testified that she had not used any drugs or alcohol for thirty-one days as of the date of the hearing. (T. 127).

The ALJ's decision provides a detailed statement of the medical and other

---

[3] A CD-4 count is a lab test that measures the number of CD-4 white blood cells in a blood sample and serves as an indicator of how well a person's immune system is functioning. A lower CD-4 count is an indicator that HIV infection is progressing. https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/

[4] The term "viral load" refers to the amount of HIV in a blood sample. https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/

evidence of record. (T. 86-106). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. ALJ's DECISION

The ALJ found that plaintiff had not been engaged in substantial gainful activity since the alleged onset date of March 15, 2006, based upon a consideration of the plaintiff's testimony and wage information, together with the evidence as a whole. (T. 91). Although plaintiff had worked occasionally after the alleged disability onset date, including as a hair stylist, the ALJ concluded that this constituted an unsuccessful work attempt. (T. 91).

The ALJ considered step two of the disability analysis in two parts. First, since plaintiff applied for DIB, the ALJ considered whether plaintiff's impairments were severe prior to September 30, 2007, the date that plaintiff was last insured. (T. 91). The ALJ reviewed the documentary medical evidence, which was dated no earlier than March 2007. (T. 92). The ALJ found that the plaintiff had a history of HIV infection dating to 1999, but without the "classic symptoms of HIV infection" such as night sweats, fatigue, chills, fever, wasting or weight loss. (T. 92). In addition, the ALJ found that plantiff had no opportunistic infections secondary to HIV, and was treated only for minor complaints such as sore throats and minor skin abscesses that were lanced. (T. 92). The ALJ also concluded that there was no evidence of mental impairment prior to the date last insured, since plaintiff did not commence mental health treatment until March 2011. (T. 92). Thus plaintiff had no severe impairments and was not disabled

prior to the expiration of her insured date.

Next, the ALJ determined that plaintiff, as of the date of the hearing, had severe impairments of PTSD and cannabis abuse. (T. 93). The ALJ found that the evidence did not establish any functional restrictions secondary to plaintiff's HIV positive status or ADHD. (T. 93). Thus, neither the HIV nor the ADHD were severe.

At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P., including the listings for mental impairments and HIV infection. (T. 93). The ALJ analyzed the requirements in each section, particularly Section 12.04, 12.06, 12.09, and Section 14.08 and stated the reasons why plaintiff's impairment did not meet those requirements. (T. 93). In making the determination regarding Sections 12.06 and 12.09, the ALJ found that plaintiff did not meet subsection B because plaintiff's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation. (T. 94). In reaching this conclusion, the ALJ cited plaintiff's testimony and consultative exams which showed that plaintiff had no restrictions in activities of daily living, had mild difficulties in social functioning, and moderate difficulties with regard to concentration, persistence or pace. (T. 93). The ALJ also found that plaintiff did not meet the subsection C criteria. *Id.*

At step four of the sequential analysis, the ALJ found that plaintiff had the RFC to perform the full range of work at all exertional levels but with certain nonexertional limitations. Specifically, the ALJ concluded that plaintiff could perform complex work

related tasks independently, could understand and follow only simple instructions and directions, could understand and perform simple tasks with supervision, could maintain attention and concentration, attend to a regular routine, maintain a schedule, interact appropriately with others in carrying out simple tasks, and handle reasonable levels of stress involving work that required decision-making directly related to the performance of simple and repetitive tasks. (T. 94).

The ALJ also found that, to the extent that plaintiff testified to greater restrictions than those identified in the RFC assessment, her testimony was not credible. (T. 98). The ALJ concluded that plaintiff did not retain the capacity to perform any of her past relevant work as a hairstylist. (T.99). However, "considering the [plaintiff']'s age, education, work experience, and residual functional capacity," there were jobs that existed in significant numbers in the national economy that plaintiff could have performed. (T. 99). The non-exertional limitations identified by the ALJ were deemed to have had little or no effect on the occupational base of unskilled work at all exertional levels. Accordingly, the ALJ determined that plaintiff was not disabled from the alleged onset date of March 15, 2006 through the date of the decision. (T. 100).

## V.    ISSUES IN CONTENTION

Plaintiff  makes the following arguments:

(1)    The ALJ  erred in finding that plaintiff's HIV positive status and ADHD did not constitute severe impairments. (Pl's. Br. at 8-15) (Dkt. No. 11).

(2)    The ALJ's RFC determination was not supported by substantial evidence. (Pl's Br. at 15-17).

(3)    The ALJ failed to properly assess plaintiff's credibility. (Pl's Br. at 17-21).

8

(4)    The ALJ did not meet his burden of proof with respect to his Step Five determination. (Pl's Br. at 21-24).

(5)    Supplementary evidence submitted to the Appeals Council is relevant to plaintiff's disability claim and should be considered in connection with the review of the ALJ's decision. (Pl's Br. at 24-25).

Defendant argues that the Commissioner's decision is supported by substantial evidence and that the additional evidence submitted to the Appeals Council did not provide a basis for altering the ALJ's decision. (Def.'s Br. at 6-19) (Dkt. No. 15). As discussed below, this court agrees with defendant and recommends dismissal of the complaint.

## DISCUSSION

## VI.    SEVERE IMPAIRMENT

### A.    Legal Standard

The claimant bears the burden of presenting evidence establishing severity at step two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as

walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. The Second Circuit has held that the step two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at step three through step five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all

of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

## B.    Application

Plaintiff argues that the ALJ erred in finding that plaintiff's ADHD and HIV positive status were not severe impairments. (Pl.'s Br. 8-15). Plaintiff argues that her ADHD causes problems with concentration, anger issues, and difficulty staying focused, which have significantly affected her ability to engage in sustained substantial gainful employment. In support of this argument, plaintiff cites to a Medical Assessment of Ability to Do Work-Related Activities (Mental) dated March 23, 2012, prepared by Scott Burnside, N.P., and countersigned by Dr. David Kang, Medical Director ("Burnside/Kang Medical Assessment") which states that plaintiff had marked restrictions in activities of daily living, marked difficulties maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (T. 408). Plaintiff also cites her own contemporaneous symptom descriptions recorded in treatment notes, including "hypervigilence, inability to maintain healthy relationships, and [inability] to maintain employment due to [lack of] interpersonal

skills." (T. 449).

While not directly addressing it during his step two severity analysis, the ALJ considered the March 23, 2012 Burnside/Kang Medical Assessment as part of his decision but decided not to give it any "significant probative weight[5]."  The ALJ cited plaintiff's testimony that plaintiff had never personally met Dr. Kang, and concluded that this "casts into doubt the existence of an actual treatment relationship between Dr. Kang and the claimant."  (T. 99).  Instead, the ALJ found that plaintiff's ADHD presented no functional restrictions.  This finding is consistent with the other evidence in the record, including the consultative examination by Dr. Noia, which found that despite plaintiff's diagnosed ADHD, plaintiff's "attention and concentration was intact" and plaintiff was able to do counting, simple calculations, and serial 3's.  (T. 286).  It is also consistent with plaintiff's statement during the exam that "treatment effectively controlled" her ADHD symptoms.  (T. 285).  While plaintiff's physicians have considered prescribing medication for ADHD, the treatment primarily consists of counseling and behavioral techniques due to plaintiff's noncompliance with prior attempts at medication and her continued use of marijuana. (T. 511, 514).  Therefore, this court finds that the ALJ's determination that plaintiff's ADHD was not a severe impairment was supported by substantial evidence.

Plaintiff argues that the ALJ erred in finding that plaintiff's HIV positive status was not a severe impairment, but her primary argument on this point is that medication

---

[5] The validity of this determination is addressed in Point VII. B, *infra.*

noncompliance may have resulted in increased viral resistance .[6]  (Pl.'s Br. at 12).  The

ALJ devoted significant attention to plaintiff's HIV treatment history and found that

plaintiff did not have the "classic symptoms" of HIV infection such as night sweats,

fatigue, chills, fever, wasting, and weight loss, and suffered no opportunistic infections

secondary to HIV disease. (T. 92).  The ALJ also found that plaintiff was frequently

non-compliant with her medication, but that she had only been treated for minor

complaints such as sore throats and minor skin abscesses during that time. (T. 92).

These findings are supported by the medical evidence.  Consultative examiner Dr.

Kalyani Ganesh found that plaintiff had no gross physical limitations related to sitting,

standing, walking or use of her upper extremities. (T. 291).  Numerous treatment notes

indicate that plaintiff's CD-4 counts and viral load were responding well to medication,

but that this response was unstable due to plaintiff's continued failure to adhere to a

treatment regimen.  (T. 271, 272, 276, 280, 281, 288, 332, 334, 339, 345, 348, 350, 355,

356, 402, 419, 424, 431).  When plaintiff takes her antretroviral medication, treatment

notes describe her HIV as "asymptomatic," and conclude that "she is not at very high

risk in terms of immunosuppression." (T. 355, 402).  The record does not show that

plaintiff was hospitalized or required emergency room treatment due to any HIV-related

complications.  Therefore, the medical evidence supports the ALJ's step two conclusion

that plantiff has no significant limitations resulting from her HIV positive status.  *See*

_____

[6] Plaintiff's brief to the Appeals Council pressed the HIV severity issue more strongly, arguing that the ALJ overlooked potential HIV-related symptoms such as fatigue, chills, fever, and weight loss.  However, while these symptoms are discussed in some of the treatment notes, the physicians and consultative examiners do not draw any connection to plaintiff's HIV.  (T. 277, 278, 284, 285, 401).

*Garner v. Astrue*, No. 3:09-CV-216, 2010 WL 3896552, *3 (W.D. Pa. 2010) (affirming ALJ's finding that asymptomatic HIV which did not result in any hospitalization or emergency room treatment for HIV-related complications did not constitute a severe impairment).

In addition, as will be discussed below, the ALJ considered plaintiff's HIV medical history[7] and her ADHD diagnosis as part of his RFC determination. (T.95-99). Because the ALJ considered these impairments as part of his RFC analysis and did not deny plaintiff's claim at step two of the sequential analysis, this court also finds that any error by the ALJ in not finding these impairments to be severe would have been harmless.

## VII.  Residual Functional Capacity ("RFC")

### A.  Legal Standard

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v.*

---

[7] The ALJ also gave "particular attention" to plaintiff's HIV medical history when evaluating whether plaintiff met or medically equaled any listed impairments at step three. (T. 93).

*Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### B.    Application

Plaintiff argues that the ALJ erred in his RFC analysis when he failed to adequately consider treating medical source reports, particularly the March 23, 2012 Burnside/Kang Medical Assessment which opined that plaintiff had marked to extreme limitations in making occupational adjustments (such as following work rules and relating to co-workers); making performance adjustments (such as understanding and carrying out complex job instructions); and making personal/social adjustments (such as behaving in an emotionally stable manner). (T. 405-07).  Plaintiff also argues that the RFC determination is inconsistent because plaintiff was found able to perform "complex work related tasks independently" and at the same time "understand and perform only simple instructions and directions" and "understand and perform simple tasks with supervision."  (Pl's Br. at 16).  However, this court finds that the ALJ's determination of plaintiff's RFC was supported by substantial evidence.

As discussed above, the ALJ reviewed the Burnside/Kang Medical Assessment but gave it no significant probative weight. (T. 99).  When a treating physician signs a report prepared by a nurse practitioner (an "other source" whose opinions are not

presumptively entitled to controlling weight), the report should be evaluated under the treating physician rule except where evidence indicates that the report does not reflect the doctor's views. *See, e.g., Djuzo v. Commissioner of Social Sec.*, No. 5:13-CV-272 (GLS/ESH), 2014 WL 5823104, at *4 & n.10 (N.D.N.Y. Nov. 7, 2014) (collecting cases). In this case, the ALJ offered sufficient evidence that the treating physician rule should not apply.

Before discounting the report, the ALJ first considered plaintiff's testimony that she had never met Dr. Kang. (T. 99, 129-130). The ALJ found that this statement "cast doubts" about whether there was an actual treatment relationship between plaintiff and Dr. Kang[8]. (T. 99). The ALJ then cited the lack of supporting mental status results for the marked and extreme limitations described in the Burnside/Kang Medical Assessment. (T. 99). For example, in March 2011 and October 2011, Nurse Practitioner Burnside examined plaintiff and found that plaintiff's thoughts were "logical and linear;" plaintiff showed "no evidence of delusions;" and her "judgment, insight, and impulsivity" were "unremarkable." (T. 485, 494). Global Assessment of Functioning ("GAF") scores[9] administered by Dr. Kang's staff in 2011 and 2012 were consistently

---

[8] A physician who does not have an "ongoing treatment relationship" with a plaintiff does not qualify as a treating physician. *See Patterson v. Astrue*, No. 5:11-CV-1143 (MAD/DEP), 2013 WL 638617, *8 (N.D.N.Y. 2013); 20 C.F.R. §§ 404.1502, 416.902.

[9] The GAF Scale (DSM—IV Axis V) ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms." *Kohler v. Astrue,* 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* at 32 (4th ed. 2000)). GAF is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-IV-TR at 32-34.

between 58 and 59. These GAF scores were indicative of moderate symptoms or moderate difficulty in social or occupational functioning, not the marked or extreme limitations described in the Burnside/Kang Medical Assessment. (Pl.'s Br. at 13).

In discounting the Burnside/Kang Medical Assessment, the ALJ also relied upon other professional evaluations, including counseling treatment notes from ARISE, Inc.; the consultative exams by Dr. Noia and Dr. Ganesh; and the Medical Interrogatory prepared by Dr. Paul Fulford, which found that plaintiff "showed a good range of emotion," was "cooperative," demonstrated an "adequate" manner of relating, social skills, and overall presentation, and appeared "relaxed and comfortable" with "intellectual functioning estimated to be in the average range." (T. 285-86, 410, 530-538). Therefore, this court finds that the ALJ had substantial evidence to justify his decision to give the Burnside/Kang Medical Assessment no significant probative weight.

The ALJ's RFC determination was also consistent with the remaining medical evidence and testimony. Dr. Ganesh's consultative exam found that plaintiff had no physical limitations related to sitting, standing, walking or use of her upper extremities. (T. 291). Dr. Noia found that plaintiff had difficulty dealing with stress, but that she appeared capable of understanding and following simple instructions and directions; performing simple and some complex tasks with supervision and independently; maintaining attention and concentration, regularly attending to a routine; maintaining a schedule; learning new tasks; making appropriate decisions; and interacting with others moderately well. (T. 286-87). Dr. Fulford similarly concluded that plaintiff was mildly

restricted for daily living activities and for maintaining concentration, persistence or pace, and had difficulty dealing with stress. (T. 531). Dr. Fulford opined that plaintiff could function in a low stress setting. (T. 534).

The plaintiff reported that she is able to dress, bathe, and groom herself, as well as cook and prepare food, do general cleaning, shop, manage money, drive and take public transportation. (T. 286-287, 410). Plaintiff was able to drive herself, and she walked to some of her medical appointments. (T. 284, 308). She also engaged in hobbies including dancing and performing stand-up comedy. (T. 121, 448, 472). Recent unsuccessful work attempts, including hair styling, ended due to difficulties interacting with co-workers and clients, rather than any physical inability to do the work. (T. 114). The ALJ's conclusion that plaintiff could perform complex work-related tasks independently, but only understand and perform simple tasks with supervision is consistent with both Dr. Noia's consultative examination and plaintiff's testimony, and is therefore supported by substantial evidence[10].

For the reasons set forth above, the ALJ properly weighed the record evidence. The court concludes that the ALJ's RFC determination was based on substantial evidence.

## VIII. <u>Credibility</u>

---

[10] The ALJ's ultimate determination that plaintiff was not disabled was based on her ability to perform an "occupational base of **unskilled** work." (T. 100). Therefore, even if the ALJ's determination that plaintiff could perform complex work-related tasks was inconsistent or erroneous, it would have been harmless.

## A.    Legal Standard

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. § 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function.  20 C.F.R. § 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any

medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

## B. Application

The ALJ found that plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (T. 78). Plaintiff argues that the ALJ found that plaintiff was not credible without providing specific justification for this conclusion.

During the hearing before the ALJ, plaintiff testified that she suffered "daily" panic attacks; that she was "constantly" breaking out in boils and had outbreaks of thrush once or twice a year in connection with her HIV; that she suffered severe side effects from her medication, including headaches, nausea, joint pain, and blisters in her mouth. (T. 115-19). Plaintiff also testified that she enjoyed dancing and performing stand-up comedy, participated in several community groups, and was still able to do some independent hairstyling for additional income. (T. 127).

In support of his determination regarding plaintiff's credibility, the ALJ appropriately considered the record evidence in accordance with 20 C.F.R. § 416.929. (T. 98-9). The ALJ specifically noted that plaintiff's HIV treatment records "demonstrate that the claimant has not suffered from opportunistic infections of any consequence." (T. 98). Plaintiff "has had skin abscesses that were treated effectively,

and these records show that this problem presented the claimant with no difficulties in ambulation." (T. 98). Likewise, the ALJ reviewed the conservative nature of plaintiff's mental health treatment, and the lack of any hospitalization for either her physical or mental impairments. (T. 99). The ALJ found no evidence of adverse side effects from her medication, despite the "strong and consistent evidence of treatment non-compliance with no valid reason for this non-compliance having been established" (T. 99). In light of the inconsistency between plaintiff's description of her symptoms and the medical evidence evaluated and cited by the ALJ, the ALJ's credibility determination was supported by substantial evidence.

## XI.    **Step Five/Vocational Expert**

### A.    **Legal Standards**

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on

these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[11] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of

---

[11] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

## B. Application

The plaintiff contends that the ALJ erred, at step five, by improperly relying solely on the Grids when plaintiff's purported non-exertional limitations required consultation with a vocational expert. As discussed in section VII.B. above, the ALJ concluded that there was no basis in the medical or other evidence to find that plaintiff was significantly physically or mentally limited in her ability to perform the full range of unskilled work across all exertional levels, and this conclusion was supported by substantial evidence. Accordingly, the ALJ was not required to further evaluate these purported limitations at step five or to consult with a VE. *See Zabala*, 595 F.3d at 411 ("[t]he ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work"; [t]hus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the [Grids at step five] was permissible"); *Lawler v. Astrue*, 512 F. App'x 108, 111-12 (2d Cir. 2013) (no vocational expert necessary when ALJ properly found that plaintiff could perform "basic work activities," notwithstanding some sources opining that plaintiff had "moderate difficulties" in concentration and dealing with others).

Because this court has found that the ALJ's RFC determination is supported by substantial evidence, and the ALJ properly found that plaintiff retained the ability to perform unskilled work at all occupational levels, there was no need to call for the

testimony of a VE at step five of the disability analysis.  The ALJ found that plaintiff's

mental impairments did not limit her ability to perform unskilled work, including

carrying out simple instructions, dealing with work changes, and responding to

supervision. Thus, her nonexertional limitations did not result in an additional loss of

work capacity, and the ALJ's use of the Medical–Vocational Guidelines was

permissible.  *Zabala*, 595 F.3d at 411.

## X.  <u>Newly Submitted Evidence</u>

Plaintiff's counsel submitted additional medical records for consideration by the

Appeals Council in April 2013.  (T. 2).  As noted above, the Appeals Council

considered this new evidence part of the record, but concluded that the additional

evidence did not provide a basis for changing the ALJ's decision.  The Appeals Council

also concluded that certain of the records related to a time period after the ALJ's

decision and therefore did not effect the determination as to whether plaintiff was

disabled as of August 2, 2012[12].  (T. 2).

### A.    **Legal Standards**

"While evidence submitted to the Appeals Council becomes part of the

administrative record to be reviewed by the court, *Perez v. Chater*, 77 F.3d 41, 45 (2d

Cir.1996), the Appeals Council . . .  will consider new evidence only if (1) the evidence

is material, (2) the evidence relates to the period on or before the ALJ's hearing

decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the

---

[12] The records which the Appeals Council determined were subsequent to the ALJ's
decision were treatment notes and hospital records ranging over the period of October 15, 2012
to April 15, 2013.

weight of the evidence, including the new evidence." *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010); 20 C.F.R. §§ 404.970(b), 404.976(b), 416.1470(b), 416.1476(b); *see also Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (new evidence forms part of the administrative record under review "only to the extent that it relates to the time frame encompassed in the ALJ's decision"). "Materiality requires that the new evidence not concern 'a later-acquired disability or the subsequent deterioration of the previous non-disabling condition.'" *Pearson v. Astrue*, 1:10-CV-521 (MAD), 2012 WL 527675, at *11 (N.D.N.Y. Feb. 17, 2012) (*citing Estevez v. Apfel*, 97 Civ. 4034, 1998 WL 872410, at *7 (S.D.N.Y. Dec. 14, 1998)). Where, as here, the Appeals Council determined that the new evidence submitted did not relate to the period on or before the ALJ's decision, "[t]he role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision." *Pearson v. Astrue*, 2012 WL 527675, at *11 (*citing Edwards v. Astrue*, 5:07-CV-898 (NAM/DEP), 2010 WL 3701776, at *7, n. 12 (N.D.N.Y. Sept. 16, 2010)).

## B. Application

The medical records submitted by plaintiff to the Appeals Council do not alter this court's conclusion that the ALJ's determination was supported by substantial evidence. The additional evidence did not raise any issues not already considered by the ALJ. For example, an April 23, 2012 treatment note indicates that plaintiff's CD-4 count had fallen, and her viral load had spiked due to medication non-compliance. (T. 539). Plaintiff also complained of an unrelated callus problem. (T. 539). Plaintiff

indicated that she did not have any nausea, vomiting, fevers, chills, or night sweats. (T. 539). Subsequent mental health evaluations addressed the anxiety, PTSD and ADHD diagnoses considered by the ALJ, but included notes that plaintiff had shown improvement in tolerating stress and was improving her focus through behavioral techniques. (T. 544-548). These additional records, particularly the treatment notes regarding plaintiff's HIV, ADHD, and PTSD are consistent with the records reviewed by the ALJ. Accordingly, this Court concludes that the Appeals Council properly determined that the foregoing evidence did not affect the validity of the ALJ's decision.

This Court also reviewed the new evidence which the Appeals Council determined covered a period after the ALJ decision. None of these documents raise any relevant considerations that would have influenced the ALJ's decision. These post-decision reports briefly address plaintiff's history of medication non-compliance, and her continuation of counseling and behavioral techniques. (T. 57). These records primarily concern unrelated and new medical issues, including a laceration on her left hand, and a shoulder injury. (T. 9, 57). Accordingly, the Appeals Council's decision not to consider this evidence of plaintiff's later medical history was supported by substantial evidence. *See, e.g.*, *Baladi v. Barnhart*, 33 F. App'x at 563-64; *McGannon v. Colvin*, 5:12-CV-359 (GLS), 2013 WL 1296383, at *3 (N.D.N.Y. Mar. 28, 2013) (additional evidence submitted to the Appeals Council that deterioration of plaintiff's back condition did not occur until early 2011 does not suggest greater limitations than those found in the ALJ's decision in September 2010); *Pearson v. Astrue*, 2012 WL 527675, at *12 (evidence of deterioration of plaintiff's carpal tunnel syndrome after the ALJ

rendered the decision is not material new evidence) (*citing Quinlivan v. Comm'r of Soc. Sec.*, 08-CV-1175, 2011 WL 2413491, at *8 (N.D.N.Y. May 23, 2011) (if the plaintiff suffered an aggravation of an impairment after the ALJ's decision, the proper remedy would be to submit a new application).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 10, 2015

Andrew T. Baxter
U.S. Magistrate Judge